# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

B.B and M.H., et al.,

        Plaintiffs,

     v.                                  Case No. 12-C-115

APPLETON AREA SCHOOL DISTRICT, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Mary Berglund was a special education teacher for cognitively disabled children in the Appleton Area School District from August 1985 until her termination on March 20, 2011, following an investigation into a report that she was physically abusive to the students in her class at Janet Berry Elementary School. Parents of the six children in Berglund's class filed this action under 42 U.S.C. § 1983 alleging violations of their children's constitutional rights and discrimination on account of their disabilities in violation of Section 5 of the Rehabilitation Act, 29 U.S.C. § 794. In addition to Berglund, the parents sued Janet Berry Principal Richard Waters, Superintendent Lee Allinger and the District. The claims of four of the children have been successfully mediated. The case is before the court on Defendants' motions for summary judgment as to the two remaining children, B.B. and M.H. For the reasons that follow, Defendants' motions will be granted.

## I. SUMMARY JUDGMENT METHODOLOGY

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This district, like most, has enacted local rules that are intended to focus both the court and the parties on the essential question in deciding any motion for summary judgment, namely, whether there are genuine disputes as to any facts that are material to the disposition of the case. Thus, the moving party is required to file along with the motion either a statement of material facts to which the parties have stipulated or a statement of proposed material facts as to which the moving party contends there is no material issue and that entitle the moving party to judgment as a matter of law. Civil L. R. 56(b)(1). The statement of proposed facts is to consist of short numbered paragraphs and include within each paragraph specific references to the affidavits, declarations, or other parts of the record that support the fact set forth in that paragraph. Civil L. R. 56(b)(1)(C)(i).

The party opposing the motion must then file a response to the moving party's statement of undisputed facts which is intended to make clear which, if any, of those facts are in dispute, and

2

to set forth any additional facts that bear on the motion. The opposing party's response must therefore reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each paragraph, including when the fact is disputed, a specific reference to the affidavit, declaration, or other part of the record that supports the claim that a genuine dispute exists as to the fact stated by the moving party. Civil L. R. 56(b)(2)(B). If the opposing party believes there are additional facts that prevent entry of summary judgment, the party should include in its response to the motion a statement, consisting of short numbered paragraphs, setting forth such additional facts, including references to the affidavits, declarations or other parts of the record relied on as support. Civil L. R. 56(b)(2)(B)(ii).

The rule warns parties that the court will deem uncontroverted statements of material fact admitted for purposes of deciding the motion for summary judgment. Civil L. R. 56(b)(4). In addition, parties are instructed that assertions of fact in their memoranda or briefs are to refer to the corresponding numbered paragraph in the statement of facts, statement of additional facts, or statement of stipulated facts. Civil L. R. 56(b)(6). When properly followed, the local rule governing motions for summary judgment allows the court to easily discern which facts are in dispute and, where the law permits, save both the parties and the court the time and expense of trial. When the rule is not followed, however, it makes the entire process more difficult and time-consuming.

In support of their motion for summary judgment, Defendants filed their proposed statement of facts. Plaintiffs did not file a response to Defendants' proposed statement of facts and thus are deemed to have admitted the facts proposed by the defendants. Plaintiffs did file their own proposed findings, which includes 136 separate proposed statements of fact. (ECF No. 60.) Civil L.R. 56(2)(B)(ii) limits the non-movant to no more than 100 separately numbered statements of

3

additional facts, absent leave of the court. No such leave has been sought here. The court will therefore limit its consideration to Plaintiffs' first 100 statements of fact to the extent they do not contradict Defendants' proposed facts that are deemed admitted. In addition, many of the facts proposed by Plaintiffs are not supported by citations to admissible evidence contained in the record. *See Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (noting that plaintiff opposing summary judgment "must produce sufficient admissible evidence, taken in the light most favorable to her, to return a jury verdict in her favor"). Allegations of the complaint, police reports, and hearsay recounted in a deposition are not admissible evidence. Proposed findings that do not properly cite to admissible evidence in the record will also be disregarded.

## II. UNDISPUTED MATERIAL FACTS

Plaintiffs B.B. and M.H. were enrolled in Defendant Berglund's class at Janet Berry Elementary School in the Appleton Area School District during the 2010-11 school term. B.B. was ten years old at the time the alleged events occurred, and M.H. was nine. Both B.B. and M.H. have cognitive disabilities. B.B. is non-verbal while M.H. has limited verbal abilities. M.H. is visually impaired. (Defs.' Proposed Findings of Fact (DPFOF) ¶¶ 1-9, ECF No. 50.)

The District, which has approximately 15,000 students, is a recipient of federal funding. Defendant Mary Berglund began her employment with the District in August 1985 as a special education teacher working with cognitively disabled children. Berglund received a bachelor's degree in special education from the University of Wisconsin at Oshkosh (UWO) in 1979 with emphasis on mental retardation (MR) and learning disabilities (LD). She received a second bachelors degree from UWO in 1990 in early childhood education. At the time of the events that

4

give rise to the action, Berglund had a lifetime teaching license in MR and a 5-year renewable licence in LD. (DPFOF ¶¶5-6, ECF No. 50.)

Janet Berry has programs for students with cognitive disabilities, learning disabilities, and autism. (*Id.* ¶¶ 14-15.) Berglund's class for the 2010-11 school year was made up of six students, and she was assisted by two paraprofessionals or teacher's aides: Doris Verboomen and Chantal George. In addition, other professionals who provided speech/language and occupational therapy had regular contact with the classroom and would pull individual children out during the day for services. Berglund's classroom was across the hall from the main office where Principal Waters' office was located. (*Id.* ¶¶ 38-42, 70, 96.)

All of the children in Berglund's class had exceptional educational needs. One of the children in Berglund's class posed more significant behavior problems than the others. T.H. was a ten-year old, non-verbal student with autism and cognitive disabilities. He often became very aggressive toward Berglund, George and Verboomen. T.H. would have "meltdowns," which would frequently entail him running around the classroom, screaming and picking things up and throwing them. He would also hit, kick, and bite if Berglund, Verboomen, or George would approach him. Berglund was bitten by T.H. several times. Verboomen was pinched by T.H. between 30 and 40 times a day. She wore guards on her arms to protect herself from the pinching. Verboomen also suffered a back injury when T.H. pulled her down to the floor. (*Id.* ¶¶ 43-51.) Aside from T.H.'s meltdowns and violent behavior, he also masturbated frequently in class, up to two to three times a week and sometimes daily. Principal Waters was aware of T.H.'s penchant for masturbating in class and that Berglund would attempt a variety of methods to redirect him. (*Id.* ¶¶ 58-61.) L.H.C., another student who could be defiant at times, was also a "runner" who would suddenly take off. (*Id.* ¶ 63.)

5

T.H.'s Individualized Education Plan (IEP) allowed staff to use a body sock and a weighted blanket to control him when he was experiencing a "meltdown." A body sock is like a sleeping bag but is made out of a swimsuit material with a hole for the head and Velcro fasteners in front. A weighted blanket is similar to an X-ray shield but larger. T.H. also wore a gait belt around his waist. A gait belt, which is about three inches wide and has four handles, is used to maintain control of a child to prevent him from running away and hurting himself or other children. (*Id.* ¶¶ 52- 57.)

The reports of abuse that underlie the action first surfaced on Sunday, January 9, 2011, when Verboomen telephoned Carrie Willer, the principal of Franklin Elementary School where Verboomen had worked prior to becoming Berglund's aide. Verboomen informed Principal Willer that she had concerns regarding Berglund's inappropriate use of force in disciplining the students in her classroom. Verboomen specifically mentioned concerns about Berglund lying on top of a student, forcefully feeding a student, and requiring school staff to knock before entering her classroom. Verboomen explained to Principal Willer that she was conveying her concerns to her instead of Principal Waters because she did not think that Waters would do what she felt needed to be done. (*Id.* ¶¶ 64-66.)

The previous week, Verboomen was concerned that she was going to be accused of child abuse herself because the mother of L.H.C. had reported to Berglund through an interpreter that her son was afraid to come to school because of Verboomen. In fact, on January 6, 2011, Verboomen had sent Principal Waters a lengthy email with a copy to Berglund defending herself against what she believed to be unjust accusations by L.H.C.'s mother. According to Verboomen, L.H.C. had bumped his head when he dove under a desk in anger over receiving "sad faces" on his daily report.

6

(*Id.* ¶¶ 87-89.) Verboomen was also in the process of transferring to a different school within the district. (*Id.* ¶ 81.)

In any event, Principal Willer telephoned Principal Waters the same day and informed him of what Verboomen had told her and that she had advised Verboomen to speak with him directly the following day. On Monday, January 10, 2011, Verboomen placed in Principal Waters' mailbox a handwritten log of events she had observed in Berglund's classroom that she had been keeping since September 2009. Verboomen began keeping the log "because she felt Berglund was trying to intimidate her into teaching the reading program." (*Id.* ¶ 70.) At about noon that day, Principal Waters called Verboomen to the office to talk with her about her allegations. When he asked her why she did not report her concerns to him earlier, Verboomen responded that she did not feel comfortable with him; they had no "connection" and no relationship. Verboomen later added that she thought Principal Waters and Berglund were friends and he had failed to address previous unrelated concerns she had brought to his attention. Principal Waters informed Assistant Superintendent Mark Huenink about Verboomen's allegations and was instructed to work with Assistant Superintendent for Student Affairs Yvette Dunlap. (*Id.* ¶¶ 67, 70, 72- 75, 83-85.)

On Tuesday, January 11, 2011, Verboomen gave Principal Waters a letter she had written the previous day after school in which she stated that that afternoon Berglund had admitted to the other classroom aide, Chantel George, that she had "body-slammed" T.H. onto a table and held his head down. Over the next two days, Verboomen gave Principal Waters two more letters in which she described other incidents that gave her concern. (*Id.* ¶¶ 76-80.) In the meantime, Principal Waters and Assistant Superintendent Dunlap met with Berglund at noon on January 11, 2011, and advised her of the allegations against her. Unable to find an immediate substitute, Berglund was

allowed to return to her classroom but was then placed on leave at the end of the day and told not to return to school.  (*Id.* ¶¶ 90-92.)

The District, the Child Protective Services division of the County Human Services Department, and local police investigated the reported abuse.  Several incidents concerning M.H. and B.B. came to light in the course of the investigation.  On December 16, 2009, Berglund slapped M.H.'s hand after M.H. pinched B.B.  The slap was between a "tap and a hit," but not hard enough to cause a red mark.  (*Id.* ¶ 113.)  On at least one occasion, Berglund treated M.H. roughly by grabbing her arm and/or neck because she wasn't following directions, causing M.H. to respond "ouch" or "owie."  (PPFOF ¶20, ECF No. 66.)  On two occasions, sometime in late 2009 and on February 17, 2010, when M.H. refused to eat her lunch, Berglund tried to force a fork into M.H.'s mouth.  M.H. resisted at first, but then opened her mouth.  M.H. did not choke and apparently suffered no injury.  (DPFOF ¶¶ 114-119, ECF No. 50 .)  On February 18, 2010, Berglund also told M.H. that she wished she could spray lemon juice in M.H.'s face because M.H. would sometimes repeat phrases very loudly.  (*Id.* ¶ 120.)  There is no evidence that Berglund ever actually sprayed lemon juice in M.H.'s face.

As to B.B., there were reports that on one occasion Berglund picked him up and forcefully placed him in a chair, and that on occasion she would grab B.B. on the back of the neck and squeeze it until he cried when he was not following her directions.  (*Id.* ¶ 112.)  Peggy Reider, an aide in Berglund's class in the 2007-08 school year, estimated that she observed Berglund squeeze B.B.'s neck in this manner about once a month.  (PPFOF ¶¶ 10, 14, ECF No. 66.)  In addition, both children witnessed Berglund's occasionally rough treatment of T.H. and other children.

Until Verboomen made her telephone call to Willer on January 9, 2011, and Willer called Waters, no one had ever raised concerns about Berglund's treatment of her students to any

8

administrator in the District, including Waters, Assistant Superintendent Yvette Dunlap, Lee Allinger, or Suzette Preston, the District's Special Education Coordinator for the area including Janet Berry Elementary School." (DPFOF ¶142, ECF No. 50.) Chantel George, who had been an aide in Berglund's classroom for seventeen years, stated that although Berglund was "kind of rough" with students, she had never seen any abusive behavior or incidents that caused her particular concern until the 2010-11 school year. George described two events in early January 2011 that had given her concerns. She stated that on January 5 and again on January 6, 2011, she observed Berglund lie on top of T.H. while he was having one of his "meltdowns." Berglund reportedly weighed 300 pounds, and T.H. weighed ninety pounds. It is unclear whether Berglund had placed her full weight on T.H. Although George stated she was not concerned for T.H.'s safety on the first occasion, she became concerned the second time because Berglund grabbed T.H.'s throat and did not let go until Verboomen shouted at her. (*Id.* ¶¶ 96-104.)

Based on the investigation, Berglund's employment with the District was terminated on March 30, 2011. By way of further background, the court notes that after the story hit the media, Berglund was charged in state court with nine counts of felony child abuse and one felony count of strangulation. Though not admissible at trial in this case, Fed. R. Evid. 410(a)(2), Berglund ultimately entered a plea of no contest to five misdemeanor counts of battery and was placed on probation. (PPFOF ¶43, ECF No. 66.) *See also State of Wisconsin v. Mary Berglund*, Calumet County Case No. 2011CF00034 (Available at http://wcca.wicourts.gov); *Former Appleton teacher gets probation for student abuse*, Appleton Post Crescent, Dec. 22, 2011 (Available at http://www.postcrescent.com/article/20111222/APC0101/112220460). This civil rights action followed.

### III. ANALYSIS

**A.  The § 1983 Claim: Did Berglund Violate Plaintiffs' Constitutional Rights?**

It is important to note at the outset what this case is not about.  It is not about whether Berglund used appropriate methods to discipline and/or maintain control of the children under her care.  It is not even about whether she violated state law or committed a crime.  Indeed, in this connection it should be noted that Wisconsin law prohibits subjecting students to corporal punishment that is inconsistent with a student's IEP, though it does authorize the use of "incidental, minor or reasonable physical contact designed to maintain order and control." Wis. Stat. §§ 118.31(1), (2), and (3)(h).  Whether Berglund violated this statute is not at issue here.  The question before the court is whether Berglund's conduct toward M.H. and B.B. amounts to a violation of their constitutional rights.  Absent a violation of the United States constitution or federal law, federal courts have no business addressing what goes on in an elementary school classroom.

Plaintiffs claim that Berglund's conduct violated their rights to substantive due process guaranteed by the Fourteenth Amendment. The Supreme Court addressed the constitutional limitations on corporal punishment of students by public school officials more than thirty-five years ago in *Ingraham v. Wright*, 430 U.S. 651 (1977).  In *Ingraham*, the Court held that the Eighth Amendment prohibition of cruel and unusual punishment did not apply in the public school setting and that the procedural requirements of the Due Process Clause of the Fourteenth Amendment were satisfied by a state's common law tort remedies. *Id.* at 683. *Ingraham* did not address the question of whether corporal punishment by school officials could violate a student's substantive due process rights.  But even though the Court did not address the precise issue raised here, its analysis sheds light on the overall question of federal court review of school discipline and is therefore a useful starting point for consideration of the issues raised here.

10

1. *Ingraham v. Wright*

*Ingraham* begins with the issue of whether severe corporal punishment of public school students can constitute cruel and unusual punishment within the meaning of the Eighth Amendment. Noting that the Eighth Amendment had historically been applied only to persons duly convicted of a crime, the Court found no reason to extend its protection to children facing school discipline given the significant differences in the circumstances of the two. "The prisoner and the schoolchild stand in wholly different circumstances," the Court noted, "separated by the harsh facts of criminal conviction and incarceration." *Id.* at 669. Whereas a "prisoner's conviction entitles the State to classify him as a 'criminal,' and his incarceration deprives him of the freedom 'to be with family and friends and to form the other enduring attachments of normal life.'" *id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), the Court noted that the circumstances of the school child were far different:

> The schoolchild has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.

*Id.* at 670.

The Court went on to note that the natural safeguard provided by the openness of the public school and its supervision by the community was reinforced by the common law. While public school teachers and administrators were privileged at common law to use such corporal punishment as is reasonably necessary for the proper education and discipline of the child, the Court noted that "any punishment going beyond the privilege may result in both civil and criminal liability." *Id.* Thus, there was no need for federal court supervision. To hold otherwise, the Court suggested,

11

would be to "make the judgment of which disciplinary punishments are reasonable and which are excessive a matter of constitutional principle in every case, to be decided ultimately by this Court." *Id.* at 670 n.39. The Court therefore concluded that the Eighth Amendment had no application to questions of school discipline. *Id.* at 671.

As to the due process claim, the Court first held that corporal punishment in public schools implicates a constitutionally protected liberty interest. *Id.* at 674. The Court noted that the liberty interest protected by the Due Process Clause encompasses freedom from bodily restraint and punishment: "It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law." *Id.* It was this constitutionally protected liberty interest that the Court found to be at stake in *Ingraham*:

> There is, of course a *de minimis* level of imposition with which the Constitution is not concerned. But at least where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated.

*Id.* The Court then turned its attention to the question of what process was due.

On that issue, the Court rejected the argument that prior notice and a hearing were required before a student could be subjected to corporal punishment and instead held that traditional common-law remedies are fully adequate to afford due process. "Teachers and school authorities are unlikely to inflict corporal punishment unnecessarily or excessively when a possible consequence of doing so is the institution of civil or criminal proceedings against them." *Id.* at 672. Although it recognized that requiring administrative safeguards of prior notice and a hearing might provide additional safeguards to students, the Court noted that such a requirement would substantially reduce the effectiveness of such punishment because of the delay it would cause.

12

"Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." *Id.* at 681 (quoting *Goss v. Lopez*, 419 U.S. 565, 580 (1975)).

Ultimately, the Court concluded that the incremental benefit prior notice and a hearing might afford did not justify the cost and burden that school administrations would incur in providing them. Faced with such a requirement, the Court reasoned that "school authorities may well choose to abandon corporal punishment rather than incur the burdens of complying with the procedural requirements" and "teachers, properly concerned with maintaining authority in the classroom, may well prefer to rely on other disciplinary measures which they may view as less effective rather than confront the possible disruption that prior notice and a hearing may entail." *Id.* at 680-81. The Court recognized that many might welcome the elimination of corporal punishment in the schools as a societal advance, but indicated that it would be better if such a policy choice proceeded from "the normal processes of community debate and legislative action," as opposed to the command of the Court, especially in light of the serious disciplinary problems schools were facing at the time. *Id.* at 681, n.53. In summary, the Court explained:

> "At some point the benefit of an additional safeguard to the individual affected . . . and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews v. Eldridge*, 424 U.S., at 348. We think that point has been reached in this case. In view of the low incidence of abuse, the openness of our schools, and the common-law safeguards that already exist, the risk of error that may result in violation of a schoolchild's substantive rights can only be regarded as minimal. Imposing additional administrative safeguards as a constitutional requirement might reduce that risk marginally, but would also entail a significant intrusion into an area of primary educational responsibility. We conclude that the Due Process Clause does not require notice and a hearing prior to the imposition of corporal punishment in the public schools, as that practice is authorized and limited by the common law.

*Id.* at 682.

13

Of course, *Ingraham* does not control here. As noted above, the Court limited its analysis in *Ingraham* to the plaintiffs' Eighth Amendment and procedural due process claims. The Court did not address whether excessive punishment could amount to a violation of some other provision of the Constitution, such as the right to substantive due process as the plaintiffs claim here. Still, the policy reasons provided by the Court for rejecting the Eighth Amendment and procedural due process claims in that case are equally applicable here. The openness of public schools to parental and community supervision, and state criminal and common law provide significant protection for children and deterrence to teacher brutality. In addition, treating school discipline as a federal issue whenever it is arguably excessive risks undermining the authority of state and school officials to prescribe and control conduct in the schools and diverting significant educational resources to legal fees and costs. At the very least, those concerns counsel a deferential standard for assessing excessive force claims against teachers or school administrators brought under the Constitution. It is with these considerations in mind that the court turns to Plaintiffs' claim that Berglund's conduct violated their right to substantive due process under the Fourteenth Amendment.

## 2. Fourth Amendment or Substantive Due Process

Defendants argue as an initial matter that in this circuit public school students do not have a substantive due process right against excessive corporal punishment. Defendants contend that the Seventh Circuit rejected substantive due process as a vehicle for analyzing corporal punishment claims in *Wallace v. Batavia Sch. Dist.*, 68 F.3d 1010 (7th Cir.1995), and instead held that such claims are analyzed under the Fourth Amendment's prohibition of unreasonable searches and seizures. Plaintiffs counter that Defendants' reliance on *Wallace* is "misplaced" and that *Wallace* has not been followed in later decisions. (Pls.' Br. in Opp'n 10, ECF No. 56.) The dispute is more than technical. The test for a Fourth Amendment violation (reasonableness) is significantly more

14

stringent than the test for a violation of substantive due process (arbitrary and conscience shocking). *See County of Sacramento v. Lewis*, 523 U.S. 833, 842-23 (1998). It is therefore necessary to carefully consider the court's holding in *Wallace*.

*Wallace* addressed a § 1983 claim against a high school business teacher who attempted to restore order when confronted with two sixteen-year-old female students who were screaming obscenities at each other. The teacher ordered both students to sit down and be quiet, but when that failed to end the confrontation, he ordered one of the students, Wallace, to get her books and leave. Wallace began walking out of the classroom slowly, and the teacher grabbed her by the wrist and then the elbow to speed her exit. Wallace resisted and told the teacher to let go. When he did, she continued to walk outside the classroom and slammed the door. Based on this self-incriminating set of facts, Wallace through her mother, sued the teacher and school asserting violations of her Fourth Amendment right to be free from unreasonable seizures and her Fourteenth Amendment right to substantive due process. The district court granted the defendants' motion for summary judgment and Wallace appealed. *Wallace,* 68 F.3d at 1011.

On appeal, the Seventh Circuit rejected the defendants' argument that the Fourth Amendment did not apply to the seizure of a student by a school official in the school setting. Noting that the Supreme Court had held in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), that the Fourth Amendment prohibition of unreasonable searches applied in the public school setting, the court held that a student's claim that she was unreasonably seized by public school officials should also be governed by the Fourth Amendment's reasonableness standard:

> [I]n the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent. Therefore, in seeking to maintain order and discipline, a teacher or administrator is simply constrained to taking reasonable action to achieve those goals. Depending on the

15

circumstances, reasonable action may certainly include the seizure of a student in the face of provocative or disruptive behavior.

*Wallace,* 68 F.3d at 1014.

Applying that standard to the facts most favorable to Wallace, the court concluded that no reasonable jury could find that the teacher's actions were unreasonable. "In fact," the court concluded, "the only thing unreasonable in this scenario is that Wallace has made a federal case out of a routine school disciplinary matter." *Id.* The court therefore affirmed the district court's dismissal of Wallace's Fourth Amendment claim and turned to her substantive due process claim.

As to Wallace's claim that the teacher's conduct constituted a violation of substantive due process, the court noted that it had "never acknowledged such a substantive due process right, much less established a test for deciding when it has been violated." *Id.* Though the decision is not entirely clear, it can be reasonably read to mean that the court found it unnecessary to decide whether there was a substantive due process right against excessive school discipline since the Fourteenth Amendment's Due Process Clause did not afford Wallace "any greater protection than the Fourth Amendment from unwarranted discipline while in school." *Id.* The court therefore concluded that "even assuming that [the teacher's] actions constituted corporal punishment, we reject Wallace's theory of recovery under the Fourteenth Amendment as we have done under the Fourth Amendment." *Id.* at 1016.

On the other hand, some of the language used by the court could be read as stating that an allegation that a teacher used excessive force in disciplining a student should always be analyzed under the Fourth Amendment and not as a violation of substantive due process. The court stated that "[b]ecause a student is at least as much seized when a school official administers corporal punishment as Wallace was here, corporal punishment may be evaluated under the Fourth

16

Amendment standard." *Id.* at 1016. Presumably, if every instance of corporal punishment by school officials constitutes a seizure within the meaning of the Fourth Amendment, then the Fourth Amendment's more stringent reasonableness standard applies and there is no need to resort to substantive due process. However, the quoted language also explicitly references the name of the student in that case, thereby suggesting that the court was tying its holding to the facts of that case.

In this court's view, *Wallace*'s rejection of the plaintiff's substantive due process claim was limited to the facts of that case and was not intended as a general rejection of substantive due process as the rubric under which excessive force claims against school officials are to be analyzed. Indeed, most of the circuits have held that corporal punishment of students by public school officials may violate substantive due process. *See* Wasserman, Lewis M., STUDENTS' FREEDOM FROM EXCESSIVE FORCE BY PUBLIC SCHOOL OFFICIALS: A FOURTH OR FOURTEENTH AMENDMENT RIGHT?, 21 Kan. Journal of Law & Public Policy 35 (2011). To instead hold that they are governed by the Fourth Amendment and make "reasonableness" the standard in such cases would run afoul of the Supreme Court's caution against "mak[ing] the judgment of which disciplinary punishments are reasonable and which are excessive a matter of constitutional principle in every case, to be decided ultimately by this Court." *Ingraham*, 430 U.S. at 470 n. 39. In effect, it would federalize the state tort law of battery as limited by the common law privilege of reasonable discipline. Finally, reading *Wallace* as a blanket rejection of substantive due process in the school setting would also ignore more recent cases where the Seventh Circuit expressly held that the conduct of school officials can violate the substantive due process rights of students. In *Sandra T. E. v. Grindle*, for example, the Seventh Circuit held that a group of elementary school girls had viable substantive due process claims against a teacher and the school principal for injuries arising out of the teacher's sexual abuse of the students at school. 599 F.3d 583 (7th Cir. 2010).

17

In this case, unlike *Wallace*, the plaintiffs have not alleged that their teacher unconstitutionally seized them. In *Wallace*, the teacher literally seized the student by grabbing her by the wrist and then elbow in an effort to escort her out of the classroom. Any force was incidental to the "seizure" and, as a result, it was reasonable to address the entire claim under the Fourth Amendment. Having concluded that Wallace's claim failed under the Fourth Amendment's reasonableness test, there was no reason to further analyze her claim under the Fourteenth Amendment since it provided the plaintiff even less protection. 68 F.3d at 1015. Here, by contrast, Plaintiffs have not alleged that they were unreasonably seized in violation of the Fourth Amendment, and the facts do not support such a claim. As public school children, their freedom was already restrained by virtue of being in school and subject to the authority of their teacher. *See Vernonia School District 47 J. v. Acton*, 515 U.S. 646, 655 (1995) (noting that public school children are subject to the state's authority in a way that has been described as "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults"). Berglund's actions were not part of an attempt to seize M.H. or B.B in order to remove them from the classroom. In fact, there is no dispute that "[o]n the occasions when Berglund used inappropriate force with the students in her classroom, she did so in the course of disciplining them." (DPFOF ¶ 127, ECF No. 50.) The court therefore agrees with Plaintiffs that their claims against Berglund for excessive force in imposing corporal punishment arise under the Fourteenth Amendment and will proceed to consider whether the facts of this case are sufficient to warrant a trial.

### 3. The Conduct Alleged Does Not Rise to the Level of a Substantive Due Process Violation

In the early post-*Ingraham* case of *Hall v. Tawney*, the Fourth Circuit held that public school students have a substantive due process right "to be free of state intrusions into realms of personal

18

privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court." 621 F.2d 607, 613 (1980). In that case, the complaint alleged that a teacher had without provocation repeatedly struck a student with a homemade paddle causing serious injury to the soft tissue of her left hip, thigh and buttock. The student was then hospitalized for ten days and received treatment from specialists for possible permanent injuries to her lower back and spine. *Id.* at 614. The district court had granted the defendants' motion to dismiss on the ground that the claim was precluded by the Supreme Court's decision in *Ingraham v. Wright*. The Fourth Circuit concluded that *Ingraham* had left open the question of whether specific instances of corporal punishment in a public school could violate a student's right to substantive due process and reversed. In so ruling, however, the court emphasized that a substantive due process claim in the context of disciplinary corporal punishment in the public schools differed by an order of magnitude from a claim of assault and battery under state tort law:

> In resolving a state tort claim, decision may well turn on whether ten licks rather than five were excessive, ... so that line-drawing this refined may be required. But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern these distinctions imply. As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience. Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may.

*Id.* at 613 (internal quotations and citations omitted).

Likewise, in *Neal v. Fulton County Board of Education*, the Eleventh Circuit "join[ed] the vast majority of Circuits in confirming that excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment as in

19

*Ingraham*, may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." 229 F.3d 1069, 1075 (11th Cir. 2000) (citing cases). In so holding, the court acknowledged the reluctance of the courts to expand the concept of substantive due process "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Id.* at 1074 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). The court also expressed concern that § 1983 not be used "to convert state tort claims into federal causes of action." *Id.* (citing *Sacramento v. Lewis*, 523 U.S. at 848). The court nevertheless concluded that the substantive component of due process was violated when the conduct could "properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* (quoting Lewis, 523 U.S. at 847). Consistent with other courts that had addressed the issue, the court held that in order to state such a claim, the plaintiff must at a minimum "allege facts demonstrating that (1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Id.* at 1075.

Plaintiffs' claims fail under this test for the simple reason that there is no evidence that either M.H. or B.B. were subjected to a force or suffered injury that could be considered shocking to the conscience. *Id.* Neither B.B. nor M.H. suffered observable or medically determinable injuries as a result of Berglund's actions. There is no dispute that most of the actions cited by Plaintiffs were taken in response to the children's failure to heed her directions. For instance, Berglund slapped M.H.'s hand to stop her from pinching B.B. Likewise, Berglund forced a fork into M.H's mouth in an attempt to get her to eat when she refused. Berglund is also accused of having grabbed B.B. by the back of the neck or arm and squeezed when he did not follow her directions. A former aide testified that Berglund would use such force that B.B. would cry and estimated that it occurred

20

approximately once a month during the 2007-08 school year. (PPFOF ¶¶ 10, 14, ECF No. 66.)
While not an appropriate way to handle the behavior problems she confronted, these actions by
Berglund, assuming they occurred as reported, can hardly be considered conscience-shocking.
Other alleged episodes, such as forcefully pushing B.B. into a chair, suggest a loss of patience or
frustration that can be experienced by those who constantly work with children that have significant
cognitive and/or behavioral impairments. They may be signs that a teacher should consider
retirement or a new line of work, but again, in the absence of evidence of even a bruise, they are not
of a magnitude that could be reasonably found to violate a child's substantive due process rights.
In this connection, it is notable that even the aide who claims to have personally witnessed
Berglund's conduct as to B.B. and M.H. waited months, if not years, to report it. This suggests that
even her own conscience was not shocked.

Given the absence of evidence of significant injury or more egregious conduct, the fact that
the plaintiffs have cognitive disabilities and limited or no verbal ability does not change the result.
It is true that unlike an unimpaired high school student who willfully refuses to obey his teacher, the
culpability of a cognitively impaired student is far less. But because of the deficits such a child has
in reasoning, understanding and language, other, more indirect ways of stopping disruptive or
dangerous behaviors, such as positive reinforcements, diversions, or timeouts, may be ineffective.
It is presumably for this reason that Wisconsin law excepts from its definition of corporal
punishment "actions consistent with an individualized educational program" and permits school
officials to use "minor or reasonable physical contact designed to maintain order and control." Wis.
Stat. §§ 118.31(1) and (3)(h). In the not-too-distant past, it was commonly accepted that a restrained
but swift swat on the rear end or a slap on the hand of a young child who had not yet developed such
capacities was the most effective way to teach him to stay away from a busy street or a hot stove.

21

While perhaps less common today, these methods of discipline are still used. Parents who use such measures are not "abusing" their children; indeed, they are trying to protect them from far more serious harm. Reasonable people can disagree about what is reasonable. As recently as last year, a group of parents of disabled children brought suit against a state education department because it *prohibited* corporal punishment. *See, e.g., Bryant v. New York State Educ. Dept.*, 692 F.3d 202 (2d Cir. 2012) (affirming district court's dismissal of § 1983 action by parents and guardians of disabled children seeking determination that state regulation prohibiting use of "aversive interventions" intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors violated students' rights under the Individuals with Disabilities Education Act, the Rehabilitation Act, due process, and equal protection). Most experts today may disagree that corporal punishment has any role to play in education, particularly special education, but it is not the role of the federal courts, under the guise of constitutional adjudication, to decide disputed issues of child discipline and pedagogy.

The Eleventh Circuit addressed the question of whether a teacher's use of force against a disabled student violated substantive due process in *T.W. ex rel. Wilson v. School Bd. of Seminole County, Fla.*, 610 F.3d 588 (11th Cir. 2010). There a teacher named Garrett was alleged to have verbally and physically abused T.W., a student with pervasive developmental disorder, on a variety of occasions. In affirming the district court's grant of summary judgment in favor of the defendant teacher, the court noted that a student's claim of excessive corporal punishment had both an objective and subjective component: "The evidence must support a reasonable inference that the punishment is 'obviously excessive' as an objective matter and that Garrett 'subjectively intend[ed] to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result.'" *Id.* at 599 (quoting *Neal v. Fulton County Bd. of Educ.*, 229 F.3d

22

1069, 1075 n.3 (11th Cir.2000)).   In determining whether the force was obviously excessive, the court noted that it considered the totality of the circumstances, including T.W.'s disability, but three factors were particularly relevant: "(1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." *Id.* (quoting *Neal*, 229 F.3d at 1075.)  Applying the factors to the undisputed facts before it, the court concluded that the amount of force used was not obviously excessive.   The evidence established that Garrett's use of force against the student was "capable of being construed as an attempt to restore order, maintain discipline, or protect T.W. from self-injurious behavior." *Id.* at 600.   Though not appropriate, the court concluded that the amount of force used was "not totally unrelated to the need for the use of force."   *Id.* at 601.   And while there was a claim of psychological effects of the conduct, the evidence showed only minor physical injuries:

> His mother saw bruises, but there is no evidence that T.W. experienced anything more than transient pain as a result of Garrett's restraints, and T.W. never received medical treatment for any physical injuries.

*Id.*   Again, the force Berglund is alleged to have used against M.H. and B.B. is far less and no injuries, not even bruises, were observed.

*Preschooler II v. Clark County School Board*, 479 F.3d 1175 (9th Cir. 2007), a case upon which the plaintiffs place great reliance, is readily distinguishable on both the law and facts from this case.   In that case a teacher was accused of abusing a four-year-old, non-verbal, autistic child diagnosed with tuberous sclerosis, a neurological disease that causes painful tumors to form in various organs.   The abuse alleged included grabbing the child's hands and using them to slap him repeatedly in the head and face, maliciously body slamming him into a chair, forcing him to walk without shoes across the asphalt from the school bus to the classroom, and the presence of bruises on his arms and thighs and a scratch on his back.   In affirming the decision of the district court

23

denying the defendants' motion to dismiss on immunity grounds, the Ninth Circuit held that under the reasonableness standard of the Fourth Amendment the allegations of slapping the child and slamming him into a chair stated a valid claim against the teacher:

> The teacher's seizure of Preschooler II and her alleged slapping, forced participation in self-beating and slamming were unreasonable in light of the child's age and disability and the context of the events. Preschooler II posed no danger to anyone nor was he disruptive in the classroom. At such a young age and suffering from significant and serious disabilities, autism as well as tuberous sclerosis, Preschooler II was even more vulnerable than the average pre-school child.

*Id.* at 1180. Moreover, "[i]n light of the clear constitutional prohibition of excessive physical abuse of schoolchildren, and the heightened protections for disabled pupils," the court concluded, "no reasonable special education teacher would believe that it is lawful to force a seriously disabled four year old child to beat himself or to violently throw or slam him." *Id.* at 1182. The court therefore held that the defendant teacher was not entitled to qualified immunity. *Id.*

Here, of course, M.H. and B.B. are more than twice as old as Preschooler II, and there is no evidence that they suffered from a painful neurological disease in addition to their disabilities. Moreover, the alleged conduct of the teacher in *Preschooler II*, causing the child to repeatedly slap himself about the head and face, was not in response to misconduct or inappropriate behavior of the child. It bore no reasonable relation to a need for order or discipline. Finally, in holding that the allegations of the complaint were sufficient to state a claim under § 1983, the Ninth Circuit was assessing the complaint under the Fourth Amendment's reasonableness standard, as opposed to the shocks-the-conscience standard for substantive due process violations that the court has found applicable here. For all of these reasons, the court does not find *Preschooler II* persuasive.

Even when considered with the surrounding circumstances, the evidence here does not support a finding of a violation of substantive due process as to either M.H. or B.B. Berglund's

24

"wish" that she could spray lemon juice in M.H.'s face is irrelevant as it is undisputed that it never occurred. Likewise, the fact that M.H. and B.B. may have witnessed Berglund's conduct toward T.H. and the other students in the class does not add to their claim. It is not even clear that the alleged abuse directed to the other children was of such a magnitude that it would amount to a violation of their own substantive due process rights. It could hardly be considered a violation to children who merely witnessed it. Plaintiffs have offered no authority that would support the extension of liability for substantive due process violations to individuals who were mere bystanders to the abuse alleged. To the extent any authority on the issue exists, it would seem to the contrary. *See, e.g., Sagan v. Sumner County Bd. of Educ.*, Nos. 3:09–cv–1003, 3:09–cv–1004, 3:09–cv–1005, 3:09–cv–1013, 3:10–cv–0075, 2013 WL 1438246, *9-10 (M.D. Tenn. Apr. 9, 2013) (holding that § 1983 claim of minor's parents was frivolous due to the absence of any evidence of physical abuse by teacher of their minor child).

In sum, viewing the evidence in the light most favorable to the plaintiffs, no jury could reasonably find that Berglund's use of force against M.H. and B.B. violated their rights to substantive due process. Summary judgment will therefore be granted on Plaintiffs' § 1983 claim against Berglund.

**B.  § 1983 Liability of the Other Defendants**

The plaintiffs also asserted § 1983 claims against Principal Waters, the District and Superintendent Allinger. Because their § 1983 claim against Berglund fails, it necessarily follows that Plaintiffs' § 1983 claims against the remaining Defendants fail as well. If Berglund is not liable for violating Plaintiffs' constitutional rights, then those who supervised or employed her cannot be liable either. Where there is no constitutional violation, there is no municipal or supervisor liability. *Matthews v. City of East St. Louis*, 675 F.3d 703, 708-09 (7th Cir. 2012).

25

Even if the claims against Berglund had survived, however, the § 1983 claims against the remaining Defendants would fail. Plaintiffs argue that Principal Waters is personally liable for Berglund's conduct in his capacity as her supervisor. But the doctrine of *respondeat superior* cannot be used to hold a supervisor liable for the conduct of a subordinate. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Waters can be liable only for what he did; there is no doctrine of supervisory liability for the errors of subordinates such as Berglund. *Paine v. Cason*, 678 F.3d 500, 512 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009)).

Plaintiffs' assert in their brief that Waters knew that Berglund was abusive to children and did nothing about it. (Pls.' Br. in Opp'n 14-15, ECF No. 56.) But they failed to place in dispute the defendants' proposed findings of fact to the contrary (DPFOF ¶¶86, 142, ECF No. 50.) Moreover, the assertions of fact set forth in Plaintiffs' brief in opposition to Defendants' motion contain no citations to the record in violation of Civil L.R. 56(b)(6). Plaintiffs' separate proposed findings of fact contain only one assertion suggesting that Waters had been previously informed of abuse by Berglund, but the supporting reference is to inadmissible hearsay. (PPFOF ¶ 68, ECF No. 66.) For the most part, the facts proposed by Plaintiffs as to Waters consist mostly of complaints that at least some of the staff did not feel comfortable talking to him. (*Id.* ¶¶ 49-60.) In essence, Plaintiffs appear to argue that even though no one told Waters about Berglund, he is nevertheless liable because the reason they didn't tell him is they felt he wouldn't do anything about it. That is not the law.

Plaintiffs also focus on Waters' behavior after Verboomen's accusations came to light. They claim he failed to immediately remove Berglund from the classroom on Monday based on Verboomen's accusations alone and instead waited until the end of the day on Tuesday after he had spoken to Berglund about the allegations. Plaintiffs also note that Waters failed to report Berglund

to the County's Child Protective Services department and accuse him of having altered or destroyed several documents or notes Verboomen had prepared about the incident. When asked at deposition about the accusations against Berglund and its aftermath, Waters asserted his Fifth Amendment privilege against self-incrimination. But whatever Waters did or did not do after the allegations came to light is irrelevant since there is no evidence that either M.H. or B.B. was subjected to abuse by Berglund after that time.

Plaintiffs also contend that the District is liable for Berglund's conduct under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978), due to its customs or policies. Again, because there was no constitutional violation, the District cannot be liable under *Monell*. But even if a constitutional violation could be shown, there is no basis for a *Monell* claim against the District.

A municipality, such as the District, may be liable for a § 1983 violation: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (citing *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995)). Plaintiffs contend that Defendants can be held liable under a *Stoneking* theory. The Third Circuit explained that "a municipality may be liable under section 1983 where its policymakers made 'a deliberate choice to follow a course of action . . . from among various alternatives,' . . . and the policy chosen 'reflects deliberate indifference to the constitutional rights of [the plaintiffs].'" *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir. 1989) (citations omitted). Neither Berglund nor Principal Waters are policymakers, thus the focus of inquiry is the District's policies. *See St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[W]hether

27

a particular official has final policy-making authority is a question of *state law*." (emphasis original) (internal quotations omitted)); *see also Gernetzke v. Kenosha School Dist. I*, 274 F.3d 464, 469 (7th Cir. 2001). Even assuming a constitutional violation, the undisputed facts establish that the District had a non-discrimination policy and a policy requiring staff to report incidents of abuse. In addition, teachers were trained in, and informed about, the appropriate use of physical restraints. There is no evidence from which to infer that the District implemented policies that reflect deliberate indifference to Plaintiffs' rights.

Lastly, Plaintiffs allege a § 1983 claim against Superintendent Allinger in his official capacity. This claim is equivalent to a claim against the District, which fails as a matter of law because Plaintiffs' constitutional rights were not violated. *See Monell*, 436 U.S. at 690 n.55. In addition, like Waters, Allinger cannot be personally liable under a theory of supervisory liability. *See Vinning-Ell v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("Section 1983 creates liability only for a defendant's personal acts or decisions."). There is no evidence that Allinger had any knowledge of Berglund's conduct prior to Verboomen's allegations, nor is there any evidence that Allinger's acts or decisions had any connection with Berglund's conduct. *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011) (explaining that a supervisor may be personally liable for acts of his subordinates only "if he approves of the conduct and the basis for it" (internal quotations omitted)).

In sum, because Plaintiffs have failed to present any evidence from which a reasonable jury could find that their constitutional rights were violated, summary judgment in favor of Defendants on Plaintiffs' § 1983 claim will be granted.

28

**C. Plaintiffs' § 504 Claim**

Plaintiffs allege in their complaint that Defendants discriminated against them on account of their disabilities by denying them a safe place to attend school and by subjecting them to physical abuse. (Compl. ¶¶ 107, 113.) Title V of the Rehabilitation Act, provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal assistance." 29 U.S.C. § 794(a). To establish a prima facie case under the Rehabilitation Act, a plaintiff must show: "(1) that he or she is a person with disabilities under the Rehabilitation Act, (2) who has been denied benefits of or excluded from participating in a federally funded program or special service, (3) solely because of his or her disability." *Bryant*, 692 F.3d, 216; *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999); *Werth v. Bd. of Directors of Public Schools of City of Milwaukee*, 472 F. Supp. 2d 1113, 1127 (E.D. Wis. 2007). Here, there is no dispute that the plaintiffs are disabled and the District is a recipient of federal assistance. To establish liability under the Rehabilitation Act, Plaintiffs must show that they were denied benefits of, or excluded from participating in, a program provided by the District, and that the District denied them benefits or excluded them because of their disability. *Berg v. Fla. Dep't of Labor & Employment Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998).

Plaintiffs acknowledge that Principal Waters and Berglund are not recipients of federal funds and cannot be held individually liable under § 504. (Pls.' Br. Opp'n 22.) Instead, Plaintiffs argue that the District is liable for the conduct of Berglund and Principal Waters on a *respondeat superior* theory. *See Silk*, 194 F.3d, 806) (holding that when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA). Plaintiffs also argue that the

29

District discriminated against them by keeping them separate and apart from non-disabled students instead of integrating them into the larger school population.

Plaintiffs have proffered no evidence from which a reasonable jury could find that either Berglund or Waters denied them benefits of or excluded them from participating in a federally funded program or special service solely because of his or her disability. As noted above, Plaintiffs have offered no admissible evidence that Waters knew about the allegedly abusive conduct by Berglund prior to Verboomen's report on January 10, 2011. Since neither Plaintiff alleges any abuse after that time, his failure to act immediately could not have contributed to any abuse they suffered. Assuming the District could be held vicariously liable for Berglund's conduct, there is no evidence she was motivated by intent to discriminate against Plaintiffs, as opposed to a misguided effort to impose discipline or mere frustration. *See T.W.*, 610 F.3d at 604-05 (rejecting plaintiff's Rehabilitation Act claim on theory of *respondeat superior* because no reasonable jury could find that teacher's treatment of plaintiff was motivated solely because of his disability).

Plaintiffs' contention that it can be inferred from Berglund's seclusion of the students in her classroom that she intentionally discriminated against them is also groundless. The undisputed facts are that Berglund had legitimate reasons to keep her classroom door closed. T.H. and L.H.C. both posed flight risks, which can be very disruptive to teaching a classroom of cognitively disabled students. Berglund kept the door closed to minimize noise and distractions from other students at Janet Berry who frequently walked past her classroom. Finally, Berglund's desire to keep the door closed and to have staff members knock before entering was reasonable in light of the need to change students who had accidents or wore diapers and T.H.'s frequent masturbation in the classroom. (DPFOF ¶¶ 16-42, ECF No. 50.) There is no evidence from which a reasonable jury could infer that Berglund kept her students secluded for the sole purpose of discriminating against

them.  In fact, her students were far from isolated, despite the fact that Berglund kept the door closed and required people to knock before entering.  There were two aides who also worked in her class, and both the speech therapist and occupational therapist would regularly enter to work with students or pull them out to work with them in their own offices.  Neither the therapists who worked with the children, nor the other special education teachers, thought it unusual or improper for Berglund to keep her door closed or ask people to knock before entering.

Finally, Plaintiffs' claim that the District intentionally discriminated against them by isolating them from other students is not properly before the court.  Plaintiffs did not allege in their complaint that the District discriminated against them by secluding them from other students.  Plaintiffs argue that the District violated their rights under § 504 by failing to place them in the least restrictive environment.  (Pls.' Br. in Opp'n 24, ECF No. 56.)  But "least restrictive environment" is a requirement of the Individuals with Disabilities Education Act (IDEA). *See* 20 U.S.C. § 1412(a)(4)-(5).  It is also subject to administrative exhaustion.  *Id.*; *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 494 (7th Cir. 2012).  Even if Plaintiffs could establish that the District failed to place Plaintiffs in the least restrictive environment, there is no evidence from which a reasonable jury could conclude that the District failed to place them in the least restrictive environment solely on the basis of their disabilities and that its decision was motivated by animus or deliberate indifference.

Because Plaintiffs' Rehabilitation Act claim fails as a matter of law, summary judgment in favor of Defendants on this claim will be granted as well.


## IV.  CONCLUSION

In sum, Berglund's conduct toward B.B. and M.H. did not violate their constitutional rights. Because there was no constitutional violation, as well as for the other reasons set forth above,

31

neither Berglund, nor any of the other defendants, can be held liable under § 1983. Plaintiffs' § 504 claim fails because there is no evidence from which a jury could find that Berglund or Principal Waters intentionally discriminated against Plaintiffs solely on the basis of their disabilities. Thus, the District cannot be liable under a *respondeat superior* theory. In addition, there is no evidence of discrimination on the part of the District itself. Defendants' motions for summary judgment (ECF Nos. 44 & 48) are therefore **granted**. The Clerk is directed to enter judgment accordingly.

      **SO ORDERED** this __31st__ day of July, 2013.


                  s/ William C. Griesbach
                William C. Griesbach, Chief Judge
                United States District Court - WIED

Case 1:12-cv-00115-WCG   Filed 07/31/13   Page 32 of 32   Document 78